IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


MADISON RIVER MANAGEMENT           )
COMPANY,                           )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )        1:03CV00379
                                   )
BUSINESS MANAGEMENT SOFTWARE       )
CORPORATION, a/k/a BMS,            )
                                   )
        Defendant.                 )


MEMORANDUM OPINION AND ORDER


OSTEEN, District Judge


        Plaintiff Madison River Management Company ("Madison")

brings this action against Defendant Business Management Software

Corporation ("BMS") seeking a declaration that certain agreements

between the parties were not void and remain in full force and

effect, and that it is not infringing BMS' software copyright.

Defendant brought a counterclaim premised on copyright

infringement under the Copyright Act of 1976 ("Copyright Act"),

as amended, 17 U.S.C. §§ 101 et seq., and violations of state and

common law.  This matter is now before the court on Plaintiff's

amended motion for summary judgment, Defendant's motion to extend

the time to respond to the summary judgment motion beyond the

expiration of a previously granted extension of time, and

Defendant's motion for leave to file an over length opposition

brief.  For the reasons set forth herein, Defendant's motions
will be denied; Plaintiff's motion for summary judgment will be
granted in part and denied in part.

## I.    PROCEDURAL POSTURE

This case has a history of unnecessary delay.  Madison
initiated this action in May 2003.  In October 2003, the parties
entered into a highly contentious discovery period, which closed
April 3, 2004.  After a hearing on April 26, the court reopened
discovery for an additional 75 days.  Before the extended
discovery period ended, Madison moved to compel the depositions
of certain BMS employees and BMS' answers to written discovery.
The court held another hearing on October 26, 2004, and
subsequently ordered BMS to secure the attendance of its
employees for depositions and awarded sanctions to Madison.
Because of the delay in completing discovery, the court extended
the dispositive motion deadline to December 1, 2004, and
continued the trial from the January 2005 to the April 2005
master calendar.

On December 1, 2004, while Madison's motion to dismiss was
being considered by the court, Madison moved for summary judgment
and for leave to file a lengthy brief.  Madison contended it
needed to file an over length brief because the case was complex
and it had to reargue points within its pending motion to
dismiss.  The court denied Madison's motion for a lengthy brief

2

on December 16 and instead gave Madison twenty days from the date of the court's forthcoming order on its motion to dismiss from which to renew its summary judgment motion. The court issued a memorandum opinion and order partially granting Madison's motion to dismiss on January 5, 2005. Therein, the court dismissed all of BMS' claims except for four copyright claims (Counts 1-4), two breach of contract claims (Counts 5 and 9), and three misrepresentation claims (Counts 10-12).

On January 19, 2005, Madison filed an amended motion for summary judgment on BMS' remaining counts and a supporting brief within the twenty-page limit specified by Local Rule 7.3(d). BMS' opposition to summary judgment was due February 18, 2005, but it moved for and was granted an extension of time up to and including March 4, 2005. No opposition brief was filed. On April 6, the clerk of court telephoned BMS' counsel and told him that because BMS had filed no opposition, the court was considering Plaintiff's motion for summary judgment unopposed.

BMS made no further filing until April 19. That day, BMS filed a motion for leave to file an opposition brief in excess of the page limit contained in Local Rule 7.3(d) and a motion to extend the time until April 18 to file its opposition.[1] BMS finally filed its untimely and over length opposition to summary

---

[1] It is indicative of BMS' behavior in this case that a second motion for extension of time was filed on April 19 seeking an extension only through April 18 for a document which was filed April 20.

3

judgment on April 20.  One week later, the court held a hearing on the motions for over length brief and late filing.

All matters pending before the court are now fully briefed. Because the court's decision on whether to accept BMS' over length, late-filed opposition brief will undoubtedly affect its analysis on summary judgment, the court will address BMS' motions first.  The court will then address whether summary judgment is appropriate.

## II. DEFENDANT'S MOTIONS FOR LEAVE TO FILE AN OVER LENGTH, LATE-FILED BRIEF

The Federal Rules of Civil Procedure give district courts discretion to permit an act to be done after the expiration of the specified period where the failure to act was the result of excusable neglect.  Fed. R. Civ. P. 6(b).  This district's local rules, which provide that "[e]xtensions will not be allowed unless the motion is made before the expiration of the specified time, except upon a showing of excusable neglect," reinforce this principle.  L.R. 6.1(a).  The term "excusable neglect," as used in the rules has been characterized as an "elastic concept," which is not limited to "omissions caused by circumstances beyond the control of the movant" and may include inadvertent delays. Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship, 507 U.S. 380, 392, 113 S. Ct. 1489, 1496 (1993).  Whether neglect is excusable is an equitable inquiry, "taking account of all relevant circumstances surrounding the party's omission,"

4

including:  (1) the danger of prejudice to the non-movant, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith.  Id. at 395, 113 S. Ct. at 1498.[2]

Taking into account all of the relevant circumstances in this case, BMS has not shown excusable neglect for its failure to timely file its opposition brief.  Weighing heavily against it is the length of the delay.  Even after BMS received a 14-day extension of time, it was over six weeks late in filing its opposition.  That significant delay is made even more remarkable by the fact that BMS delayed for almost two weeks after receiving a deficiency notice from the clerk of court that the summary judgment motion was being considered unopposed.  See Brewer v. Jefferson-Pilot Standard Life Ins. Co., 333 F. Supp. 2d 433, 436 (M.D.N.C. 2004) (finding no excusable neglect for failure to file an opposition to summary judgment, where plaintiff was notified by the clerk of court that the motion would be treated as

---

[2]  In Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 113 S. Ct. 1489 (1993), the Supreme Court construed the phrase "excusable neglect" as it is used in Bankruptcy Rule 9006(b)(1).  The Fourth Circuit has held that the Pioneer analysis has "general application to the consideration of excusable neglect" under the Federal Rules of Civil Procedure.  Skinner v. First Union Nat'l Bank, No. 98-1627, 1999 WL 261944, at *2 (4th Cir. May 3, 1999); see Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 533 (4th Cir. 1996) (citing United States v. Hooper, 9 F.3d 257, 259 (2d Cir. 1993), for the proposition that "nothing in Pioneer limits its interpretation of 'excusable neglect' to the Bankruptcy Rules").

unopposed and the plaintiff failed to respond until two weeks later).

A second factor of great weight is the reason for delay. Despite defense counsel's contentions that the delay was caused by the sheer volume of documents and evidence counsel had to review in preparing an opposition, these were matters within his control. Defense counsel was added to the case in August 2004, but chose not to review any evidence or discovery until Madison filed its summary judgment motion in January 2005. Only then did counsel decide to review over 1,300 pages of deposition testimony and 1,500 pages of discovery, apparently leaving an additional 10,000 pages of discovery completely unreviewed. While counsel may contend that it was not prudent to review the case so far in advance of trial to save costs and energy, the court cannot conceive of any way counsel could have ever expected to review all of the evidence and complete an opposition brief within the 30 days allotted under local rules. This is not a case of inadvertence. Counsel made a strategic decision.

The court cannot excuse the conduct of counsel because he inherited the case from another attorney and is a sole practitioner, for those matters were also within his control. It is counsel's responsibility, once he undertakes representation of a client, to ensure that he is capable of handling his case load or else to associate with co-counsel who can assist in the matter. See, e.g., North Carolina Rules Prof'l Responsibility 1.1 ("A lawyer shall not handle a legal matter that the lawyer

6

knows or should know he or she is not competent to handle without associating with a lawyer who is competent to handle the matter. Competent representation requires the legal . . . preparation reasonably necessary for the representation."). The court cannot be expected to consider counsel's individual capabilities to comply with court deadlines. See Pioneer, 507 U.S. at 398, 113 S. Ct. at 1499; Shoaf v. Kimberly-Clark Corp., 294 F. Supp. 2d 746, 749 (M.D.N.C. 2003) (holding that counsel's case load, which created a conflict with the due date for a response brief, did not constitute excusable neglect).

The court is also troubled by what it perceives as defense counsel's possible bad faith. Defense counsel has acted less than forthright with opposing counsel and this court about the reasons for delay. BMS' first request for an extension of time was based solely on its counsel's heavy case load. (Mot. Extend Time Respond Mot. & Br.) However, opposing counsel was told, and defense counsel later acknowledged, that the request for an extension was based in part on defense counsel's prepaid vacation plans. (Madison's Agreement BMS' Mot. Ext. Time File Opp'n Mot. Summ. J. at 1.) Moreover, there is some indication that defense counsel had suggested "play[ing] dumb" about the filing deadlines and asked local counsel to avoid contact with opposing counsel and the court during the period of delay. (Aycock Decl. Apr. 19, 2005 ¶¶ 14, 18, 21.) Such behavior cannot be rewarded with leniency.

7

Lastly, the consequences of BMS' delay are not inconsequential. The court has expended energy and resources considering the several motions filed as a result of the delay and in holding a hearing. Madison and its counsel have also invested time and energy. Rescheduling this matter for trial, which is the normal course, has also been delayed.

In summary, the court can find no excusable neglect in BMS' failure to timely file its opposition brief. Defense counsel was aware of the deadlines, his noncompliance, and its ramifications, yet still he chose not to comply with the court's deadlines. During this time, he refused to consult with the court or opposing counsel about the delay. When the brief was filed, it was 51 pages, vastly over the 20-page limit imposed by local rules, <u>see</u> L.R. 56.1(c), despite having notice that the court was not keen on lengthy briefs because of its previous denial of Madison's motion. The court must enforce the meaning and intent of the rules under which it operates. Failure to do so would be a greater injustice than that of which BMS will most surely complain. Therefore, BMS' motion to extend the time to respond to Madison's motion beyond the expiration of the previously granted extension of time and BMS' motion for leave to file an over length response brief will be denied.

## III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### A. Background[3]

Plaintiff Madison is a telecommunications company that specializes in rural telephone services. Defendant BMS is a software company that designed, developed, and copyrighted a suite of computer applications specifically for the telecommunications industry called the Ticket Control System ("TCS").[4]

#### 1. The TCS Program

The TCS suite enables telecommunications companies to automatically manage the supply of service to and problems with their telephone networks. The TCS suite identifies network problems, schedules and assigns personnel to fix the problems, arranges for materials needed to make such repairs, and tracks the repair through completion. The TCS suite includes "TCS Control," the core event manager, and five additional products: (1) "TCS Provide" for service provisioning; (2) "TCS Resolve" for trouble management; (3) "TCS Force" for workforce management; (4) "TCS Satisfy" for customer care; and (5) "TCS Defend" for fraud

---

[3] Because BMS has waived its right to oppose summary judgment by filing an untimely brief, the court has accepted the facts as established in Madison's motion for summary judgment except where contradicted by its own evidence or admissions in its pleadings.

[4] BMS received two certificates of copyright registration for its TCS suite, the second occurring in 2000. (Howe Dep. 4/1/04 at 46.)

9

detection.  (Howe Dep. 4/1/04 at 36-39.)  The TCS program
utilizes a customer's raw data that is saved in an Oracle
relational database by imposing on the raw data a new structure
and metadata[5] enhancements.  (Howe Dep. 11/10/04 at 5, 10, 14.)
The raw data subjected to the TCS structure, processes, triggers,
program modules, and stored procedures is called the "TCS
database."  (Id. at 9.)

### 2. The Software License Agreement

After lengthy meetings over a period of several months, BMS
and Madison executed a Software License Agreement ("Agreement")
on or about September 10, 2000, under which BMS licensed its TCS
Control and TCS Provide software to Madison.  Under the
Agreement, Madison purchased 15 TCS Control licenses and 15 TCS
Provide licenses for its Gulf Telephone Company ("Gulf") division
and was to pay for any actual use exceeding the 15 licenses.[6]
(Exs. Br. Supp. Madison River's Mot. Summ. J. Ex. G at 6 ¶ 3.3,
and at 16; Howe Dep. 4/1/04 at 99.)

---

[5]  Metadata means, literally, data about data.  It describes
"how and when and by whom a particular set of data was collected,
and how the data is formatted."  Webopedia, Jupitermedia
Corporation, at http://www.webopedia.com (last modified April 20,
2004).

[6]  A license, under the terms of the Agreement, is a
"concurrent connection" to the TCS program and "includes all
users and processes that require a connection to the TCS
Database."  (Exs. Br. Supp. Madison River's Mot. Summ. J. Ex. G
at 16.)  "Concurrent connections" are the "maximum number of
simultaneous sessions that may be connected to the specified TCS
Database at a given point in time by employees or processes
authorized by [Madison]."  (Id. at 3 ¶ 1.3; Howe Dep. 4/1/04 at
107.)

### 3. The Dispute Over the Scope of a "License"

According to the Agreement, the TCS software was to be up and running at Madison by February 1, 2001 (Exs. Br. Supp. Madison River's Mot. Summ. J. Ex. G at 25), but it was not in live operation until late October 2001. (Howe Dep. 4/1/04 at 125.) Less than a month after the TCS software became operational, BMS notified Madison that its use was exceeding its licenses. (Id. at 86, 89.)

BMS asserted Madison had to purchase a separate license for each connection that a program makes to the TCS database (Id. at 107), meaning that one user of the system who accessed a dozen customer accounts at one time could potentially require a dozen licenses. (See id. at 119.) BMS also asserted that the system itself, without any user, could run processes that required licenses. (Id. at 109-10.) Madison disagreed that it was exceeding its licenses because it understood each license to cover one user accessing the database. (Becker Decl. ¶ 2.) Under Madison's understanding, one user who accessed a dozen customer accounts at one time would require only one license.

At the time, there was some belief that Madison's alleged overuse was temporarily caused by delays in another software project between BMS and Madison.[7] As a result, BMS took no

---

[7] In early 2001, Madison asked BMS to design an interface between the TCS Provide/Control system and the billing system used at Gulf. (Howe Dep. 4/1/04 at 135.) The interface project was substantially delayed and therefore not operational until May (continued...)

action with regard to the overuse. Nevertheless, even after the other software project was completed in late May 2002, BMS asserted that Madison's use of the TCS software was still exceeding its licenses under the Agreement.

In the summer of 2002, Madison requested that BMS quote a price for an unlimited use license, also known as a site license. (Madison's Ans. & Affirm. Defenses to Am. Countercl. ¶ 43.) The site license contemplated was for the entire suite of TCS software. (Howe Dep. 4/1/04 at 259.) On August 1, 2002, representatives of BMS and Madison met to discuss the TCS software. (Madison's Ans. & Affirm. Defenses to Am. Countercl. ¶ 44.) In that meeting, BMS made a presentation in which it projected a high level of return on investment for Madison if it purchased a site license. (Id. ¶ 46; Howe Dep. 4/1/04 at 157-61.) Madison, for its part, acknowledged it had realized some cost savings at its Gulf location as a result of the TCS software. (Madison's Ans. & Affirm. Defenses to Am. Countercl. ¶ 45.)

When Madison did not purchase a site license following the parties' meeting, BMS gave Madison a notice of violation of the Agreement and of BMS' copyright. (Exs. Br. Supp. Madison River's Mot. Summ. J. Ex. J ¶ 2.h., j.) BMS also invoiced Madison for

---

[7](...continued)
30, 2002. (Id. at 134-35.) BMS acknowledges that the interface could have reduced the number of concurrent connections made by Madison to the TCS database. (Id. at 86.)

its allegedly excessive use of 136 licenses at the high water mark. (Howe Dep. 4/1/04 at 100, 196.) The invoices totaled over $1 million. (Id. at 195.) In response to the notice of violation and invoices, Madison changed BMS' password needed to access Madison's TCS server, essentially revoking BMS' access. (Madison's Ans. & Affirm. Defenses to Am. Countercl. ¶ 50.) After Madison received written assurances from BMS that it would not limit the database license key, it reinstated BMS' access. (Id. ¶ 51.)

Madison invoked the dispute resolution provision in the Agreement and the parties entered into private mediation in early November 2002. (Howe Dep. 4/1/04 at 171.) The parties then entered into negotiations to resolve Madison's alleged overuse. (Id. at 178.) During the negotiations, Madison agreed to again consider whether to purchase a site license for a TCS suite of products, including evaluating potential cost savings. (Madison's Ans. & Affirm. Defenses to Am. Countercl. ¶¶ 54, 55.)

### 4. The New Agreements

Based on their discussions, the parties executed a First Amendment to the Software License Agreement ("First Amendment") and an Expanded License Letter of Intent ("Letter of Intent") on December 5, 2002. The First Amendment provides that Madison would purchase 45 additional TCS Control and 45 additional TCS Provide concurrent connections for the sum of $300,000. (Br. Supp. Madison River's Mot. Summ. J. Ex. H at 1 ¶ 1.) The First

13

Amendment also contains mutual releases of any disputes arising in conjunction with the original License Agreement. (<u>Id.</u> at 1-2, ¶¶ 4-5.) The Letter of Intent acknowledges Madison's intent to "enter into an expanded license agreement and business relationship." (Br. Supp. Madison River's Mot. Summ. J. Ex. I at 1.) It sets forth that the parties would hold a "Kickoff Meeting" to discuss BMS' TCS suite so the parties could begin to explore the feasibility and cost effectiveness of purchasing additional BMS products. (<u>Id.</u> at 1 ¶ 1.) It further provides that the parties "shall target to have a preliminary assessment of and conversion plan to additional BMS products" by January 17, 2003. (<u>Id.</u> at 1 ¶ 2.) Following the preliminary assessment, Madison agreed to notify BMS of whether it intended to "roll out" additional BMS products. (<u>Id.</u> at 1-2 ¶ 2.) If Madison elected to roll out additional products, the Letter of Intent set forth additional responsibilities of Madison in furtherance thereof, and payment and price schedules. (<u>Id.</u> at 2-3.) If Madison elected not to roll out additional products, Madison agreed to pay BMS $150,000, the Letter of Intent would then terminate, and the Agreement and Second Agreement would remain in effect. (<u>Id.</u> at 2 ¶ 4.)

### 5. The Post-Agreement Disputes

Madison assembled a team of people who gathered and analyzed information about Madison's operations and evaluated the benefit of the BMS suite of products. (Amburn Decl. ¶¶ 6-7.) The parties held a kick-off conference call on December 10, 2002, and

14

an in-person meeting at Gulf on January 8, 2003.  (Howe Dep. 4/1/04 at 187, 218-19; Exs. Br. Supp. Madison River's Mot. Summ. J. Ex. L.)  Thereafter, the parties did not work together on an assessment plan.  On or about January 16, 2003, Madison sent a letter to BMS advising it in writing that Madison had elected not to roll out additional products.  (Amburn Decl. ¶ 14.)  The letter was not received by BMS, who on or about February 19, 2003, called Madison to inquire about the preliminary assessment. (Howe Dep. 4/1/04 at 245; Howe Dep. 11/10/04 at 140.)  Madison then informed BMS about the January 16 letter and its decision. (Howe Dep. 4/1/04 at 245.)  It later tendered to BMS the $150,000 required by the Letter of Intent, but BMS rejected the payments, believing Madison was not acting in good faith.  (Id. at 202, 206; Amburn Decl. ¶ 15.)  After further discussions between the parties broke down, Madison initiated this action.

**B.   STANDARD OF REVIEW**

Summary judgment is appropriate when an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrate that there is no genuine issue of material fact, thus entitling the moving party to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986).  The basic question in a summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986).  Summary judgment should be granted unless a

15

reasonable jury could return a verdict in favor of the nonmovant on the evidence presented.  McLean v. Patten Cmties., Inc., 332 F.3d 714, 719 (4th Cir. 2003) (citing Anderson, 477 U.S. at 247-48, 106 S. Ct. at 2509-10).  A court "must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence."  Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004) (citing Thompson v. Aluminum Co. of Am., 276 F.3d 651, 656 (4th Cir. 2002)).  Although the court must view the facts in the light most favorable to the nonmovant, see Anderson, 477 U.S. at 255, 106 S. Ct. at 2513, "bare allegations unsupported by legally competent evidence do not give rise to a genuine dispute of material fact."  Solis v. Prince George's County, 153 F. Supp. 2d 793, 807 (D. Md. 2001); see Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985), abrogated on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct. 1775 (1989) ("Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice.").  When a party fails to respond to a summary judgment motion, it may leave uncontroverted those facts established by the motion, but the moving party must still show that the uncontroverted facts entitle it to judgment as a matter of law.  Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993).

## C.  ANALYSIS

Of the claims brought in BMS' first amended answer and counterclaim, four claims for copyright infringement (Counts 1-

16

4), two for breach of contract (Counts 5 and 9), and three for misrepresentation (Counts 10-12) survived dismissal. Madison moves for summary judgment on these remaining claims. The court will begin its analysis with the misrepresentation claims.

### 1. Defendant's Misrepresentation and Concealment Claims (Claims 10-12)

BMS brings three claims based upon alleged wrongful acts of Madison during the parties' negotiations between September and December 2002 leading up to the signing of the First Amendment and the Letter of Intent. In Claim 10, BMS contends that certain fraudulent misrepresentations made by Madison induced BMS to execute the First Amendment and Letter of Intent. Claims 11 and 12 contain allegations of fraudulent concealment and negligent misrepresentation, respectively, during the negotiations. Madison advances four reasons, based upon North Carolina law, why summary judgment should be entered against BMS on these claims: (1) BMS has offered no evidence that Madison did not intend to perform when it signed the Letter of Intent; (2) the claimed misrepresentations are too imprecise; (3) BMS has not shown justifiable reliance; and (4) there is no evidence of a duty to disclose the allegedly concealed, or negligently misrepresented, facts.

Madison has failed to meet its burden of showing it is entitled to judgment as a matter of law because it erroneously advances its arguments under North Carolina law. A federal court sitting in diversity must apply the choice-of-law rules from the

17

forum state.  <u>Wells v. Liddy</u>, 186 F.3d 505, 521 (4th Cir. 1999).
Thus, the court must look to North Carolina's choice-of-law rules
as they apply to fraud and misrepresentation.  Under North
Carolina law, matters affecting the substantial rights of parties
are determined by <u>lex loci delicti</u>, the law of the situs of the
claim.  <u>Boudreau v. Baughman</u>, 322 N.C. 331, 335, 368 S.E.2d 849,
853-54 (1988).  For actions sounding in tort, such as fraud and
misrepresentation, the state where the injury occurred is
considered the situs of the claim.  <u>Id.</u>  An injury occurs where
"the last event necessary to make a defendant liable for an
alleged tort occurs."  <u>Brendle v. General Tire & Rubber Co.</u>, 408
F.2d 116, 117 (4th Cir. 1969) (quoting Restatement (First) of
Conflict of Laws § 377 (1934)) (internal quotation marks
omitted).

Madison argues that North Carolina law controls because the
alleged misrepresentations and concealments took place in North
Carolina.  (Br. Supp. Madison River's Mot. Summ. J. at 5-6.)
This position, however, disregards the clear holdings within this
circuit and of this court.  In an unpublished decision, the
Fourth Circuit, applying the <u>lex loci delicti</u> doctrine to a fraud
action absent state law authority adopting a different approach,
followed the Restatement view that "when a person sustains a loss
by fraud, the place of the wrong is where the loss is sustained,
not where the fraudulent representations are made.  <u>Jordan v.
Shaw Indus., Inc.</u>, No. 96-2189, et al., 1997 WL 734029, at **3

(4th Cir. Nov. 26, 1997) (quoting Restatement (First) of Conflict of Laws § 377 n.4 (1934)). Jordan has been explicitly adopted by this district, see Rhone-Poulenc Agro S.A. v. Monsanto Co., 73 F. Supp. 2d 554, 556 (M.D.N.C. 1999), and its adoption has been implicitly reaffirmed by this court. See Norman v. Tradewinds Airlines, Inc., 286 F. Supp. 2d 575, 584 (M.D.N.C. 2003) (citing Rhone-Poulenc Agro). It has also been adopted by other districts in this circuit. See, e.g., Insteel Indus., Inc. v. Costanza Contracting Co., 276 F. Supp. 2d 479, 487-88 (E.D. Va. 2003). Applying these cases, it is clear that Colorado law governs Defendant's fraud and misrepresentation claims because Defendant suffered any injury as a result of alleged misrepresentations in Colorado, its principal place of business.

The Jordan decision and the subsequent adopting opinions within this circuit cannot be disregarded. Plaintiff's counsel failed to follow this line of controlling cases and instead advanced arguments for summary judgment under North Carolina law. Under the circumstances, the court will not venture into the realm of the unbriefed, expending its own resources determining whether Madison's arguments are valid under Colorado law. Plaintiff has failed to meet its burden of showing it is entitled to relief as a matter of law. Summary judgment will be denied as to Defendant's misrepresentation and concealment claims (Claims 10-12).

> **2. The Release of Defendant's Claims for Copyright (Claims 1-4) and Claim for Breach of the Software License Agreement (Claim 5)**

19

The next argument Madison advances on summary judgment is that BMS' claims for copyright and claim for breach of the Agreement were surrendered by a release provision in the First Amendment. The First Amendment contains language which purports to release Madison from "any and all claims . . . raised in connection with any disputes in conjunction with [Madison's] performance under the Original [Agreement] . . . up to and through the date of this First Amendment." (Br. Supp. Madison River's Mot. Summ. J. Ex. H ¶ 4.) Madison argues this release language clearly surrenders any of BMS' claims, including its copyright claims and claim for breach of the Agreement, which rest on events occurring before the execution of the First Amendment. (Id. at 11-12.) Madison acknowledges, however, that the release is effective only in the absence of fraud and misrepresentation and is contingent upon the court's entry of judgment in its favor on Claims 10 through 12. (Id. at 11.) Because the court has denied summary judgment on BMS' fraud and misrepresentation claims, the issue of waiver is not ripe for adjudication. Thus, the court will deny summary judgment on this ground and consider Madison's arguments as to the merits of BMS' claims.

### 3.    Defendant's Copyright Claims (Claims 1-4)

BMS brings four claims alleging copyright infringement in its first amended answer and counterclaim. Because Madison brings unique arguments as to each of the four claims, the court will consider them separately.

### a. Copyright Infringement for Use in Excess of Plaintiff's Licenses (Claim 1)

In its first copyright claim, BMS alleges the Agreement provided that Madison would pay for each additional concurrent connection to the TCS database in excess of the 15 licenses purchased. (Def.'s First Am. Answer & Countercl. ¶¶ 71-73.) BMS further alleges that Madison exceeded its licenses, was billed for that excessive use, and has not paid the outstanding invoices. (Id. ¶¶ 74-83.) BMS concludes that Madison's excessive, unpaid use was therefore unauthorized and constitutes copyright infringement. (Id. ¶¶ 84-91.) Madison argues on summary judgment that its excess use cannot be unauthorized because excess use is contemplated and explicitly allowed in the Agreement. (Br. Supp. Madison River's Mot. Summ. J. at 12-13.) Any violation of the Agreement, according to Madison, is a breach of the term requiring payment for excess use and is contemplated by BMS' claim for breach of the material terms of the Agreement (Claim 5). (See Def.'s First Am. Answer & Countercl. ¶¶ 139-42.)

Whether a licensor has a claim for breach of contract, copyright infringement, or both depends upon the nature of the violation of the license agreement. 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.15[A]. If the licensee's alleged conduct constitutes a breach of a covenant and the covenant is an enforceable contractual obligation, the licensor's sole remedy is for breach of contract. Graham v. James, 144 F.3d 229, 237-38 (2d Cir. 1998) (citing 3 Melville B. Nimmer & David

21

Nimmer, Nimmer on Copyright § 10.15[A]).  However, if the
licensee's improper action constitutes a failure to satisfy a
condition[8] of the license, for which, obviously, no rights have
been licensed, that use is unauthorized and may constitute
copyright infringement.  Id.  This is the result where a licensee
exceeds the scope of a license agreement.  Evolution, Inc. v.
SunTrust Bank, 342 F. Supp. 2d 943, 953 (D. Kan. 2004) (citing
Sun Microsys., Inc. v. Microsoft Corp., 188 F.3d 1115, 1121 (9th
Cir. 1999).

     Here, the wrongful act alleged in this copyright claim is
the excessive use of the TCS database without payment.  The
Agreement provides that "[i]f [Madison] exceeds the number of
licenses purchased[,] [Madison] has 30 days to remit payment for
the actual number of licenses used."  (Exs. Br. Supp. Madison
River's Mot. Summ. J. Ex. G at 6 ¶ 3.3, and at 16.)  No part of
the Agreement or grant of the license is conditioned upon payment
for the excess use.  The Agreement presupposes that excess use
comes before payment, essentially granting permission for the
excess use and then requiring payment for it.  Courts have held
payment terms are covenants where permission precedes payment.

---

     [8]  A condition is "any fact or event which qualifies a duty
to perform," Costello Publ'g Co. v. Rotelle, 670 F.2d 1035, 1045
n.15 (D.C. Cir. 1981) (citing Arthur L. Corbin, Conditions in the
Law of Contract, 28 Yale L. J. 739 (1919)), or "an event, not
certain to occur, which must occur, unless its non-occurrence is
excused, before performance under a contract becomes due."
Restatement (Second) of Contracts § 224 (1981).

See, e.g., Graham, 144 F.3d at 238 (holding payment of royalties was a covenant of a license agreement where permission for use of computer programs preceded payment); Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749, 753-54 (11th Cir. 1997) (holding payment of royalties was a covenant of a license agreement where permission for performance of a song preceded payment). Because the payment term is a covenant of the Agreement, Defendant's remedy does not lie in copyright infringement, but in breach of contract. Summary judgment will therefore be granted in favor of Madison on this claim.

### b. Copyright Infringement for Making the ProvideC Copy of the TCS Database (Claim 2)

Paragraph 3.5 of the Agreement provides that Madison may not make any copy of the "computer program" except for a single archival copy.[9] (Exs. Br. Supp. Madison River's Mot. Summ. J. Ex. G at 6 ¶ 3.5.) Madison admits that it made an archival copy of the program and that, in addition, "every evening it takes a snapshot picture of the Madison River data contained within the TCS database for the purpose of generating reports using the Madison River data," which it labels "ProvideC." (Madison's Ans. & Affirm. Defenses to Am. Countercl. ¶¶ 98-99.) BMS claims this

---

[9] The Agreement contains another exception to the "no copy" rule which is not relevant here, but is discussed below. See infra section III.C.3.b.iv.

23

nightly copying of the TCS database constitutes copyright infringement. (Def.'s First Am. Answer & Countercl. ¶¶ 94-108.)

Madison brings four arguments for summary judgment on this claim: (1) the TCS database which was copied is not part of BMS' copyright; but even if the TCS database is part of BMS' copyright, its use was (2) fair use under the Copyright Act; (3) an "essential step" in the use of the TCS program; and/or (4) authorized by the License Agreement. (Br. Supp. Madison River's Mot. Summ. J. at 13-16.)

### i. Whether the TCS Database is Copyrighted

To establish copyright infringement, a party must prove ownership of a valid copyright and copying of the constituent elements of the work that are original. <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296 (1991). Madison challenges the first element, a valid copyright, claiming BMS' copyright on its TCS software does not extend to the TCS database.[10] The court disagrees.

The TCS database is a compilation for purposes of copyright. The Copyright Act defines a "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that

---

[10] The second element of infringement does not appear to be in dispute because Madison admits to nightly copying the TCS database. (Madison's Ans. & Affirm. Defenses to Am. Countercl. ¶¶ 98-99.)

24

the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. Compilations are copyrightable, but the copyright "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." Id. § 103(b). In Feist, the Supreme Court clarified the scope of copyright in compilations. There, the Court held that a "factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement. In no event may copyright extend to the facts themselves." 499 U.S. at 350-51, 111 S. Ct. at 1290.

Here, there is no dispute that BMS' software created the TCS database, which the court finds to be an original arrangement of facts. The TCS program utilizes Madison's raw data that is saved in an Oracle relational database by imposing on the raw data a new structure and metadata enhancements. (Howe Dep. 11/10/04 at 5, 10, 14.) It is the raw data subjected to the TCS structure, processes, triggers, program modules, and stored procedures which then becomes the TCS database. (Id. at 9.) Thus, the TCS database is covered by Defendant's copyright over its TCS software. This comports with other decisions finding similar databases copyrighted. See, e.g., Assessment Techs. of WI, LLC v. WIREdata, Inc., 350 F.3d 640, 643 (7th Cir. 2003) (finding that developer of copyrighted software had a valid copyright in a database compilation of real estate information because "no other real estate assessment program arranges the data collected by the

25

assessor in these 456 fields grouped into these 34 categories, and because this structure is not so obvious or inevitable as to lack the minimum originality required"); <u>Matthew Bender & Co. v. West Publ'g Co.</u>, 158 F.3d 693, 699 (2d Cir. 1998) (recognizing that West Publishing had a valid copyright in a CD-ROM compilation of federal judicial opinions).

### ii. Whether Madison's Copying of the TCS Database Was Fair Use

Madison contends it nightly copied the TCS database in the form of ProvideC to "create and test additional programs to run in conjunction with BMS' Provide software and to run reports."[11] (Becker Decl. ¶ 5.) In doing so, it did not alter the source code of the TCS software, has not sold or distributed ProvideC, and has made no commercial use of ProvideC as to any third party. (<u>Id.</u> ¶ 6.) Furthermore, Madison has not used ProvideC to compete with the TCS products. (<u>Id.</u>) Therefore, Madison argues its copying of the TCS database to make the ProvideC copy is fair use under section 107 of the Copyright Act.

Section 107 of the Copyright Act provides that making a copy of a copyrighted work for "purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. In determining whether a

---

[11] For its part, BMS concedes it has no independent knowledge of what the ProvideC database was used for other than what Madison has admitted. (Howe Dep. 11/10/04 at 27.)

particular use is fair use, courts are to consider factors
including the following: (1) the purpose and character of the
use, including whether such use is of a commercial nature or is
for nonprofit educational purposes; (2) the nature of the
copyrighted work; (3) the amount and substantiality of the
portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value
of the copyrighted work. Id.

Applying the statutory factors and considering all of the
evidence before it, the court cannot find that Madison's copying
of the TCS database is fair use as a matter of law. In reaching
this conclusion, the court finds the case of Assessment
Technologies particularly insightful. There, a company called
WIREdata requested information for use by real estate brokers
about specific properties, such as address, owner's name, the age
of the property, its assessed value, etc., from certain Wisconsin
municipalities. WIREdata sought the raw data collected by tax
assessors hired by the municipalities and typed into a computer
program called "Market Drive." Market Drive was developed and
copyrighted by Assessment Technologies ("AT") and licensed to the
municipalities. When assessors entered the raw information into
Market Drive, the program automatically compiled the raw data
into 456 fields (or categories of information) grouped into 34
master categories known as tables. The newly-compiled data was

27

then saved in an electronic file as a database.  AT sued to prevent WIREdata from acquiring the raw data from the Market Drive software, claiming the data could not be extracted without infringement of its copyright.  The United States District Court for the Eastern District of Wisconsin held in favor of AT.  Id. at 648.

On appeal, the Seventh Circuit first found the Market Drive database to be copyrighted.  Id. at 643.  It then discussed the means by which the raw data could be extracted from Market Drive's tables and fields without copying Market Drive's copyrighted structure.  The first option was to use the tools in the Market Drive program itself to extract the data and place it in a separate electronic file.  The second extraction possibility, made possible by the fact that the database is a Microsoft Access file, was to use Microsoft Access to extract the data and place it in a new file, bypassing Market Data entirely.  Either of these options, the court held, would not infringe AT's copyright because only the raw data would be extracted.  Id. at 643-44.

The court went further, however, by discussing other methods of acquiring the raw data under the fair use doctrine.  The court found that removing the raw data from Market Drive, even if it required copying the Market Drive structure, would be fair use.

28

<u>Id.</u> at 644-45. Relying on <u>Sega Enterprises Ltd. v. Accolade,</u>

<u>Inc.</u>, 977 F.2d 1510 (9th Cir. 1992), the court stated

> if the only way WIREdata could obtain public-domain
> data about properties in southeastern Wisconsin would
> be by copying the data in the municipalities' databases
> as embedded in Market Drive, so that it would be
> copying the compilation and not just the compiled data
> only because the data and the format in which they were
> organized could not be disentangled, it would be
> privileged to make such a copy, and likewise the
> municipalities.  <u>For the only purpose of the copying</u>
> <u>would be to extract noncopyrighted material</u>.

<u>Id.</u> at 644-45 (emphasis added).  Thus, if the municipalities

copied the database file and gave it to WIREdata to extract the

data, that copying would be fair use.

In this case, like in <u>Assessment Technologies</u>, the computer

program at issue imposes on raw data a certain structure.  Also

similar, the plaintiff here, Madison, has few options in

retrieving its raw data once it has been enhanced by the TCS

software.  BMS acknowledges that "[i]t's not physically possible

to extract the data without [the TCS] enhancements," even if

Madison wanted to.  (Howe Dep. 11/10/04 at 35.)  The only way to

extract the raw data from the TCS database would be for Madison

to pay BMS to "write an enhanced routine to do that . . . but as

TCS is right now installed, without altering it, it would not be

possible."  (<u>Id.</u>)  As a result, under <u>Assessment Technologies</u>,

Madison would be privileged to copy the TCS database in order to

extract its raw data under the fair use doctrine.  <u>See</u> <u>Sega</u>

29

Enterprises, 977 F.2d at 1527 ("[W]here disassembly is the only way to gain access to the ideas and functional elements embodied in a copyrighted computer program and where there is a legitimate reason for seeking such access, disassembly is a fair use of the copyrighted work, as a matter of law.").

The court is not convinced, however, that Madison copied the TCS database to extract its raw data as was at issue in Assessment Technologies. The intended use of the ProvideC copy of the TCS database was to, among other things, run reports. Running reports, as the court sees it, necessitates using the TCS data structure. In fact, the complex TCS structure, the subject of the copyright, appears to be the very advantage of running the reports from the TCS database instead of from raw data. (See Howe Dep. 11/10/04 at 31 ("Now, I think the reason customers pay us for our [TCS structure] is we do, I dare say, a tad bit more than just regurgitating out low-level information.).) The court in Assessment Technologies contemplated this type of use as outside the realm of fair:

> [I]f WIREdata said to itself, "Market Drive is a nifty way of sorting real estate data and we want the municipalities to give us their data in the form in which it is organized in the database, that is, sorted into AT's 456 fields grouped in its 34 tables," and the municipalities obliged, they would be infringing AT's copyright because they are not licensed to make copies of Market Drive.

30

350 F.3d at 643. Because the court cannot find Madison copied the TCS database to extract its raw data and there is a question as to whether Madison copied the database in order to take advantage of the TCS data structure, the copyrighted element of the program, the court declines to find that Madison's creation of ProvideC is fair use as a matter of law.

### iii. Whether Madison's Copying of the TCS Database Was "An Essential Step in the Utilization of the Computer Program"

Madison alternatively argues that its copying of the TCS database falls under Section 117 of the Copyright Act as an essential step in the utilization of the TCS program.

Section 117(a) of the Copyright Act provides that it is not an infringement for the "owner of a copy of a computer program" to make another copy or an adaptation of the program provided "that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." 17 U.S.C. § 117(a)(1). It is widely accepted that Congress looked to and followed the recommendations contained in the Final Report of the National Commission on New Technological Uses ("CONTU") of Copyrighted Works when it enacted § 117. See 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.08; see also, e.g., Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d

31

1240, 1252 (3d Cir. 1983) ("(W)e can consider the CONTU Report as accepted by Congress since Congress wrote into law the majority's recommendations almost verbatim."); <u>Midway Mfg. Co. v. Strohon</u>, 564 F. Supp. 741, 750 (N.D. Ill. 1983) (stating that "the CONTU Report reflects the Congressional intent").  The CONTU report contained the following explanation for its recommendation concerning copying as an essential step in the utilization of a computer program:

> Because the placement of a work into a computer is the preparation of a copy, the law should provide that persons in rightful possession of copies of programs be able to use them freely without fear of exposure to copyright liability.  Obviously, creators, lessors, licensors, and vendors of copies of programs intend that they be used by their customers, so that rightful users would but rarely need a legal shield against potential copyright problems.  It is easy to imagine, however, a situation in which the copyright owner might desire, for good reason or none at all, to force a lawful owner or possessor of a copy to stop using a particular program.  One who rightfully possesses a copy of a program, therefore, should be provided with a legal right to copy it to that extent which will permit its use by that possessor.

2 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 8.08[B][1] (quoting the CONTU Final Report at 13).  The right of an owner[12] of a copy of a computer program to make a copy as an

_____

[12]  There is an additional question whether Madison is even an owner of a copy of the TCS software as required by the statute.  Whether the court uses the formal title test from <u>DSC Communications Corp. v. Pulse Communications, Inc.</u>, 170 F.3d 1354, 1361 (Fed. Cir. 1999), or the incidents of ownership test from <u>Krause v. Titleserv</u>, 402 F.3d 119, 124 (2d Cir. 2005), the
(continued...)

"essential step," has been held to be no broader than the above-quoted rationale for the privilege, so that it is only a copy made by the very act of installing a program into a computer that is privileged. Id.; see Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 261 (5th Cir. 1988) ("Congress recognized that a computer program cannot be used unless it is first copied into a computer's memory, and thus provided the § 117 exception to permit copying for this essential purpose."); see also Sega Enterprises, 977 F.2d at 1520 (quoting the CONTU Final Report and holding that the defendant's use went "far beyond that contemplated by CONTU").

Madison's nightly copying of the TCS database into ProvideC was not the type of use contemplated by Congress in passing § 117. There are no allegations that Madison could not make actual use of the TCS software without copying the TCS database, such as the necessary copying of software onto a computer's hard drive as part of the installation process. Instead, the ProvideC copy was made to "help [Madison] more effectively utilize BMS'[] TCS Provide product" (Becker Decl. ¶ 5 (emphasis added)), which as a

---

[12](...continued)
language in the License Agreement appears to only grant Madison permissive use of the software, not ownership. (See, e.g., Exs. Br. Supp. Madison River's Mot. Summ. J. Ex. G at 3 (stating "BMS Corporation is willing to grant MRC the right to use such software"); id. at 4 ¶ 2.2 (stating "MRC is not granted any right to the Source Code of the Licensed Software").) If Madison is not an owner of a copy of the software, § 117 is wholly inapplicable.

33

matter of logic and of definition forecloses it from being necessary or absolutely essential. Accordingly, the exception contained in § 117 of the Copyright Act does not apply.

> **iv. Whether the Agreement Authorized Madison's Copying of the TCS Database**

Madison's last argument with regard to ProvideC is that its copying is authorized in the Software License Agreement. Section 13.2 of the Agreement permits Madison to reproduce two copies of the Object Code for each data center at which the software is installed, "at no additional charge, for training, testing and back-up or archival purposes only." (Exs. Br. Supp. Madison River's Mot. Summ. J. Ex. G § 13.2.) Madison admits using ProvideC to run reports, a use that is not permitted by Section 13.2 of the Agreement. (Becker Decl. ¶ 5.) As a result, Madison's copying of the TCS database is not authorized by the Agreement.

In summary, the TCS database is covered under the copyright registered by BMS for its TCS software. Madison's copying of the TCS database is not fair use or a necessary step under the Copyright Act and is not authorized under the Agreement. Therefore, summary judgment will be denied on this copyright claim.

34

### c. Copyright Infringement for Connecting to the TCS Database Through the Remedy Program (Claim 3)

When the parties executed the Agreement in September 2000, Madison obtained licenses from BMS to operate TCS Control, the core event manager, and TCS Provide, for service provisioning. It did not purchase the right to use TCS Resolve, BMS' trouble management software, or any other products in the TCS software suite. (Howe Dep. 11/10/04 at 36.) Instead, sometime after the installation of the TCS products, Madison purchased a competing program for trouble management called "Remedy." After it was installed, when an employee of Madison used the Remedy program, it automatically extracted Madison's raw data from the TCS database to create "trouble tickets," which are assignments to repair customer problems. (Madison's Ans. & Affirm. Defenses to Am. Countercl. ¶¶ 110-11; Howe Dep. 11/10/04 at 37.) BMS contends Madison's use of Remedy to connect to the TCS database was unauthorized and is therefore copyright infringement. BMS also contends that, in September 2002, immediately after BMS invoiced Madison for the alleged overuse and Madison revoked BMS' access, Madison began to use the Remedy software in a different manner. (Howe Dep. 11/10/04 at 38.) BMS contends that Madison began making provisioning orders in TCS Provide, copying them into Remedy in the form of trouble tickets, and then instructing its employees to view them in Remedy so that Madison would not

use any TCS Provide licenses. (_Id._ at 35-38.) BMS argues this workaround constitutes copyright infringement. Madison argues both actions constitute fair use because it did not disassemble, decompile, or reverse engineer any of BMS' software program. (Becker Decl. ¶ 7.)

Madison's use of Remedy to access the TCS database is similar to that in Assessment Technologies and, thus, constitutes fair use. As opposed to copying the TCS database to run reports, here Madison was only after its raw data, data that was unprotected yet substantially commingled with the copyrighted TCS data structure. The fact that Madison was using Remedy, a product in competition with BMS' TCS Resolve to access the data, does not change the outcome. _See_ Evolution, Inc. v. SunTrust Bank, 342 F. Supp. 2d 943, 952, 955-56 (D. Kan. 2004) (holding incidental copying of the plaintiff's software source code to extract and convert the defendant's raw data for use by software of another vendor was fair use). BMS cannot hold Madison's raw data hostage by imposing a monopoly of access under the auspices of copyright in hopes of extracting greater license fees.

The court's opinion differs regarding the alleged workaround. According to the court's understanding of the TCS program, once TCS Provide was used to create the provisioning orders, Madison's data was no longer raw, but subjected to the TCS structure, processes, triggers, program modules, and stored

36

procedures. That data, subject to the copyrighted structure, was then copied and viewed in Remedy so as to circumvent use of licenses. This type of workaround is of a commercial nature and shifts the balance from fair use. See Harper & Row Publishers v. Nation Enters., 471 U.S. 539, 562, 105 S. Ct. 2218 (1985) (holding that the critical consideration for determining a commercial nature is "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price"). Although Madison was not obligated to use TCS Provide to do its provisioning orders, it was obligated to pay for any use it made of the software or to desist from using BMS' copyrighted data structure to its advantage. As a result, summary judgment will be denied on this claim.

> **d.  Copyright Infringement for Writing Programs to Connect to the TCS Database (Claim 4)**

Once the TCS software was installed at Gulf, Madison created several programs and utilities that used BMS' TCS schema[13] and "stored procedures for technical development," and manipulated the enhanced data in the database. (Howe Dep. 11/10/04 at 70, 73). These programs include "CUTS," which processes the

---

[13]  Schema is defined as "the structure of a database system, described in a formal language supported by the database management system." Webopedia, Jupitermedia Corporation, at http://www.webopedia.com (last modified June 21, 2002). In a relational database, the schema defines the tables, the fields in each table, and the relationships between fields and tables. Id.

37

assignment of large groups of telephone lines to particular
physical locations (id. at 66, 74); an administrative and address
range utility (id. at 75, 77); a project utility (id. at 80); and
"BRIO," a report utility (id. at 82). (See Exs. Br. Supp.
Madison River's Mot. Summ. J. Ex. K at 3.) BMS argues these
programs infringed its copyright by altering, enhancing, and
otherwise modifying the TCS software. (Def.'s First Am. Answer &
Countercl. ¶¶ 120-38.) Madison argues on summary judgment that
any copying or modification of the TCS software by its utilities
and programs is incidental to accessing its own raw data and thus
fair use. Madison alternatively argues that the use is necessary
and thus permitted by § 117 of the Copyright Act.

Madison's use of the protected TCS data structure through
access by its utilities and programs is not an essential step in
the utilization of the computer program for the reasons set forth
above. See supra section III.C.3.b.iii. The court does,
however, find any use of TCS data structure by Madison's
subsequent works to be incidental, limited, and not in direct
competition with BMS' software. As a result, this use is similar
to the simple Remedy access and is thus fair use under the
Copyright Act, as supported by Assessment Technologies and
Evolution.

The court will not, however, grant summary judgment on this
claim because BMS' claim as to the CUTS program is not simply for

38

unauthorized use of the TCS data structure. There is evidence that Madison copied one of its TCS modules to create CUTS. In 2002, BMS started working on telephone line cutover functionality as a module to TCS Provide and called it "Technical Inventory Management." (Howe Dep. 11/10/04 at 66, 67.) At this same time, Madison was developing CUTS to do the same function. (Id. at 68.) Madison requested detailed information including designs from BMS under the auspices of purchasing BMS' Technical Inventory Management module. (Id.) Technical designs were sent to Madison by BMS. (Id.) When Madison completed its CUTS program, it used BMS' technical specifications. (Id.) The court finds BMS' Technical Inventory Management module to be a "derivative work" under the Copyright Act, see 17 U.S.C. § 101 (defining a derivative work as "a work based upon one or more preexisting works"), and as such is subject to copyright protection. Id. § 103. Madison's copying of the technical designs and specifications would constitute copying of the nonliteral elements of the software, which include its structure. See General Universal Sys., Inc., v. Lee, 379 F.3d 131, 142 (5th Cir. 2004) (defining the nonliteral elements of software to be structure, sequence, organization, user interface, screen displays, and menu structures). Such copying is not excepted use under the Copyright Act. Accordingly, the court will deny Madison's motion for summary judgment as to the copying of the

39

Technical Inventory Management module and creation of the CUTS
utility.

### 4. Defendant's Breach of Contract Claims (Claims 5 and 9)

Two breach of contract claims survived Madison's motion to
dismiss.  The first is for breach of the Agreement of September
10, 2000 (Claim 5).  The second is for breach of the First
Amendment and the Letter of Intent, both executed on December 5,
2002 (Claim 9).

### a. Breach of the Software License Agreement (Claim 5)

BMS brings a general claim for Madison's alleged breach of
the Agreement, without alleging specific breaches.  (Def.'s First
Am. Answer & Countercl. ¶¶ 139-42.)  BMS did, however, identify
several specific breaches of contract in its answers to
interrogatories, three of which appear to pertain to the
Agreement.  These breaches include Madison's alleged use of the
TCS database in excess of the licenses purchased, its failure to
pay all amounts owed under the Agreement, and its revocation of
BMS' access to the TCS software and license key.  (Exs. Br. Supp.
Madison River's Mot. Summ. J. Ex. J at 4 ¶ 5.a. – c.)  Madison
argues that judgment should be entered in its favor because this
claim is either released or preempted by the Copyright Act.

Both of Madison's arguments must be denied.  First, because
the court will deny summary judgment on BMS' fraud and

40

misrepresentation claims, <u>see</u> <u>infra</u> section III.C.2., the issue
of waiver is not ripe for adjudication.    Second, the court has
already determined herein that BMS' claim for excessive use of
the TCS software is more appropriately a breach of contract claim
than a copyright infringement claim because the Agreement
contained an express promise to pay for excess use.  <u>See</u> <u>infra</u>
section III.C.3.a.  As explained in the court's memorandum
opinion and order on Madison's motion to dismiss (<u>see</u> Mem. Op. &
Order Jan. 5, 2005, at 10-13), this express promise to pay
creates an extra element which prevents preemption by the
Copyright Act and brings this claim within the purview of <u>Acorn</u>
<u>Structures, Inc. v. Swantz</u>, 846 F.2d 923, 926 (4th Cir. 1988)
(holding that the plaintiff's breach of contract claim was not
preempted because the corresponding promise to pay for <u>any</u> use by
the defendant constituted an extra element).[14]  Accordingly,
Madison's motion for summary judgment will be denied as to this
claim.

    **b. Breach of the First Amendment to the**
      **Software License Agreement and Expanded**
      **License Letter of Intent (Claim 9)**

---

[14]  Even if the claim for failure to pay for excessive use
were preempted, the claim for breach of the Agreement would
survive dismissal under the premise that it was a breach for
Madison to revoke BMS' access to the TCS database and license
key.  Madison has offered no argument as to why this theory of
breach would be preempted by the Copyright Act and the court can
think of no basis for preemption because the act complained of
does not violate one of the exclusive rights granted by a
copyright.  <u>See</u> 17 U.S.C. § 106.

41

Claim 9, like the foregoing breach of contract claim, asserts a general breach of the First Amendment and Letter of Intent without stating any particulars. (Def.'s First Am. Answer & Countercl. ¶¶ 152–57.) However, of the specific allegations of breaches of contract BMS identified in its answers to interrogatories, Madison believes twelve pertain to the Letter of Intent. (<u>See</u> Exs. Br. Supp. Madison River's Mot. Summ. J. Ex. J at 4 ¶ 5.d. – o.) Madison argues that it should prevail on this claim because none of the alleged breaches identified in BMS' interrogatories relates to any specific obligation imposed on Madison by the express language of the Letter of Intent.

Even if Madison is correct and there are no obligations in the Letter of Intent which correspond to BMS' allegations, Madison is not entitled to judgment as a matter of law. First, absent an unambiguous integrated contract, BMS may advance its contract claim on the alleged breaches even if there are no corresponding obligations expressed in the writing. The parol evidence rule, one of the foundational rules of contract law, generally prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing. <u>Tripp v. Cotter Corp.</u>, 701 P.2d 124, 126 (Colo. App. 1985); <u>see generally</u> Richard A. Lord, 11 <u>Williston on Contracts</u> § 33:1 (4th

42

ed.).  However, where it is shown that a writing was not intended
to be fully integrated, terms other than those set forth in the
writing may be proved by parol evidence.  <u>Coulter v. Anderson</u>,
357 P.2d 76, 80 (1960).

The evidence presented here establishes that the Letter of
Intent was not intended to memorialize all of the details agreed
to by the parties.  Gregory Howe, president of BMS, testified at
his deposition that "the [Letter of Intent and First Amendment]
didn't include everything that [the parties] had come to
agreement on."  (Howe Dep. 4/1/04 at 270-71.)  He further
testified that the parties discussed clarifying the terms of the
agreement, but nothing further was done.  (<u>Id.</u> at 309.)  Further
evidence of nonintegration is found in the writing itself.  In
its opening paragraph, the Letter of Intent provides that "[a]s
noted below, this expanded relationship is subject to certain
conditions precedent and approvals, <u>including but not limited to</u>
. . . ."  (Exs. Br. Supp. Madison River's Mot. Summ. J. Ex. I at
1 (emphasis added).)  It also provides, "The parties acknowledge
that this Letter of Intent does not contain all matters upon
which agreement must be reached to consummate the proposed
expanded relationship."  (<u>Id.</u>)  Under the circumstances, and
taken in the light most favorable to BMS, the court cannot find

43

the Letter of Intent unambiguous and fully integrated.[15]

Second, even if BMS were prohibited from advancing its breach of contract claim upon the extra-contractual terms that were allegedly part of the Letter of Intent, it may still proceed under a theory of breach of the implied duty of good faith and fair dealing. Colorado recognizes that every contract contains an implied duty of good faith and fair dealing. Amoco Oil Co. v. Ervin, 908 P.2d 493, 498 (Colo. 1995). When the duty is violated, the underlying contract is considered breached. Wheeler v. Reese, 835 P.2d 572, 578 (Colo. App. 1992). "The good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations." Ervin, 908 P.2d at 498. Good faith performance of a contract involves "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc., 872 P.2d 1359, 1363 (Colo. App. 1994). Nevertheless, the duty of good faith and fair dealing applies only when the manner of performance under a specific contract term allows for discretion by either party. Ervin, 908 P.2d at 498. Discretion

_____

[15] If the Letter of Intent were fully integrated, BMS could still offer the evidence of additional terms if it can prove inducement by fraud or negligent misrepresentation, see Tripp v. Cotter Corp., 701 P.2d 124, 126 (Colo. App. 1985) (noting that the parol evidence rule applies absent allegations of fraud, accident, or mistake), neither of which has been foreclosed as a matter of law.

44

exists when the parties, at formation, defer a decision regarding performance terms of the contract.  Id.

In this case, there is sufficient evidence that Madison had discretion regarding its performance under the Letter of Intent in such matters as determining feasability and cost effectiveness, conducting a preliminary assessment and conversion plan, and electing whether to roll out additional TCS products. Because determining whether a party to a contract acted in good faith is a question of fact determined on a case-by-case basis, id., which is inappropriate for summary judgment, Madison's motion will be denied on this ground as well.

**IV.  CONCLUSION**

For the reasons stated herein,

IT IS ORDERED that BMS' Amended Motion to Extend Time to Respond to Motion and Brief Beyond the Expiration of the Specified Time [81] is DENIED.

IT IS FURTHER ORDERED that BMS' Motion for Leave to File Brief in Excess of Local Rule 7.3(d) Page Limit [82] is DENIED.

IT IS FURTHER ORDERED that Madison River's Amended Motion for Summary Judgment [71] is GRANTED in part and DENIED in part. The motion is GRANTED as to copyright claim 1 (use in excess of Plaintiff's licenses).  The motion is DENIED as to copyright claim 2 (infringement for making the ProvideC copy), claim 3

45

(connecting to the TCS database through Remedy), and claim 4
(copying the Technical Inventory Management module to create
CUTS); breach of contract claims 5 and 9; and misrepresentation
and concealment claims 10, 11, and 12, which are controlled by
Colorado law.

This the 31st day of August 2005.


_____
United States District Judge